IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LORRAINE BARELA,

        Plaintiff,

vs.                                      Civ. No. 11-632 MCA/ACT

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** comes before the Court on the Motion to Reverse or Remand the

Administrative Agency Decision and Memorandum in Support of Motion to Reverse or Remand

Administrative Agency Decision ("Motion") of the Plaintiff Lorraine Barela ("Plaintiff"), filed

April 4, 2012 [Docs. 20 and 21]. The Commissioner of Social Security ("Defendant") filed a

Response on June 13, 2012 [Doc. No. 22], and Plaintiff filed a Reply on July 2, 2012

[Doc. No. 23]. Having considered the Motion, the memoranda submitted by the parties, the

administrative record and the applicable law, the Court recommends that the motion to remand

be granted.

## I.  PROCEDURAL RECORD

On July 14, 2008, Plaintiff protectively filed an application for Social Security Disability

Insurance Benefits ("DIB") under Title  II of the Social Security Act, 42 U.S.C. §§ 401.  Plaintiff

---

[1] On Order of Reference [Doc. No. 7] was entered on August 3, 2011, referring this case to Magistrate
Judge Alan C. Torgerson to conduct, hearings, if warranted, including evidentiary hearings, and to perform any legal
analysis required to recommend to the Court an ultimate disposition of the case.

was insured for benefits through June 30, 2007, and must show that she became disabled on or

before that date. [Tr. at 20, 22.]  Plaintiff alleges a disability beginning October 31, 2006, due to

degenerative joint disease in her left knee, arthritis, diabetes, hypertension, a thyroid condition,

and high cholesterol.  [Motion at 2; Tr. 22, 58, 112, 135.]  Her application was initially denied on

September 24, 2008, and denied again at the reconsideration level on November 10, 2008.

[Tr. 15.]

        The ALJ conducted a hearing on December 7, 2009. [Tr. 27-51.]  At the hearing,

Plaintiff was represented by Attorney Michael Armstrong.  On February 26, 2010, the ALJ

issued an unfavorable decision.  In her report, the ALJ found that through the date last insured,

Plaintiff "had 'severe' impairments consisting of degenerative joint disease of the knee and

status postmeniscal repair on the left [knee.]" [Tr. 22.] In addition, the ALJ found that Plaintiff

"carried a diagnosis of adult onset diabetes mellitus," but that it was a "non-severe" impairment

during the relevant period. [Id.]  The ALJ concluded that the Plaintiff did not have an

impairment or combination of impairments that met or medically equaled one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1. [Id.] The ALJ found that through the

date last insured, Plaintiff had the residual functional capacity to perform a full range of

sedentary work as defined in CFR 404.1567(a) "which allows her to sit and stand alternately

every twenty to thirty minutes and which involves no kneeling, crouching, crawling, or

climbing." [Tr. 23.]  In considering the claimant's age, education, work experience, and residual

functional capacity, the ALJ determined that Plaintiff was capable of performing her past

relevant work as a training advisor. [Tr. 27.]

On May 12, 2011, the Appeals Council issued its decision denying Plaintiff's request for review and upholding the final decision of the ALJ. [Tr. 1.] On July 15, 2011, the Plaintiff filed her Complaint for judicial review of the ALJ's decision.

Plaintiff was born on February 24, 1951. [Tr. 112.]  The Plaintiff completed one year of college and has past work experience as a file clerk from 2002 through 2007, and as a training advisor for the City of Albuquerque from 1970 through 1997.  [Tr. 136, 139, 170-172.]  The claimant did not engage in substantial gainful activity during the relevant period of her alleged onset date of October 31, 2006, through her date last insured of June 30, 2007. [Tr. 22.]

## II.  STANDARD OF REVIEW

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).   Social Security

regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. §

404.1520.[2]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) to two inquiries: first, whether the decision was supported by substantial evidence; and

second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208,

1214 (10th Cir. 2004) (quotation omitted).  Substantial evidence is such evidence as a reasonable

mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the

record taken as a whole, and the court will "meticulously examine the record in order to

determine if the evidence supporting the agency's decision is substantial, taking 'into account

whatever in the record fairly detracts from its weight.'" *Id.*, *quoting Washington v. Shalala*, 37

F.3d 1437, 1439 (10th Cir. 1994).  The court "may neither reweigh the evidence nor substitute"

its opinion for that of the Commissioner.  *Hamlin*, 365 F.3d at 1214 (quotation omitted).

### III.  MEDICAL HISTORY

Plaintiff was 57 years old at the time she applied for DIB. [Response at 2.]  In applying

for DIB, Plaintiff identified her medical problems as arthritis, knees, diabetes, high blood

pressure, thyroid, and high cholesterol. [Tr. 135.] Plaintiff explained that her medical problems

---

Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that she has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(C).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1183 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

limited her ability work because "I can't sit for long periods, I can't stand for long, I can't walk

much without pain and need to sit, my diabetes I have days that are bad and I don't feel good."

[Tr. 135.]  Plaintiff indicated that she stopped working on October 31, 2006, because "the job

ended and the business closed down." [Tr. 135.]

The following represents Plaintiff's medical history prior to the date she was last insured

(June 30, 2007).

A.      **Degenerative Joint Disease of the Knee**

On May 25, 2005, Plaintiff was seen by Dr. Tina Welker for a routine diabetes mellitus

follow-up, but reported that she was having leg pain, heel pain, and knee pain. [Tr. 265.]

Dr. Welker's exam notes with respect to Plaintiff's complaints of pain primarily focused on the

Plaintiff's heel pain, noting an assessment of "plantar fasciitis" and indicating a follow up with

podiatry if her condition did not improve. [Id.] Dr. Welker suggested arch supports and

stretching, and advised the Plaintiff to limit herself to three (3) 800 mg. ibuprofen per day and

that it was "ok to add Tylenol" for pain.  [Id.]

On May 18, 2006, Plaintiff saw Dr. Tina Welker complaining that "both knees hurt."

Dr. Welker noted that Plaintiff reported "knees aching ↑ x 1 wk, L > R." [Tr. 263.] Plaintiff

indicated she had tried ibuprofen and Tylenol for the pain, and had also tried her daughter's

Vicodin, which helped. [Id.] Plaintiff reported she was sleeping okay, and that the pain was

worse with walking, standing and bending. [Id.] Dr. Welker's exam was positive for swelling,

popping, and buckling. [Id.]  Dr. Welker assessed Plaintiff with "L knee strain," and referred

Plaintiff for bilateral knee films and physical therapy. [Id.] Dr. Welker prescribed over-the-

counter ibuprofen and hydrocodone 5mg/500mg tabs x 30 for pain. [Id., Tr. 312]

On May 18, 2006, Plaintiff had x-rays taken in the Radiology Department of Presbyterian Medical Group. [Tr. 290.] Radiologist Dr. Eugenio Rivera evaluated Plaintiff as having "degenerative changes without fracture." [Id.]

On May 25, 2006, Dr. William Ritchie of New Mexico Orthopaedics prepared correspondence to Dr. Welker regarding his evaluation and findings after examining Plaintiff based on Dr. Welker's referral. [Tr. 286.]  In that correspondence, Dr. Ritchie noted that Plaintiff reported pain since May 16, 2006, after she "stepped off a stool and had sudden pain medially in the knee." [Id.] Plaintiff also reported that "[s]he went through a short course of physical therapy which did not help." [Id.]  Dr. Ritchie found Plaintiff to be "an active, healthy-appearing woman in no apparent distress." [Id.] Dr. Ritchie additionally reported:

> She has an active range of motion approximately 0-125 degrees.  She has a negative Lachman with a good end point.  Negative anterior and posterior drawer signs. Negative pivot shift.  There is some medial joint line tenderness.  Positive medial McMurray's for pain.  There are no lateral symptoms noted.  There is no patellar apprehension, a mild amount of quadriceps inhibition.  She ambulates with a cane in the right hand.  She has fairly neutral alignment overall.  Her skin is intact.  She is neurologically intact and vascularly intact to both lower extremities.

[Id..]  Following his exam, Dr. Ritchie was concerned that Plaintiff may have a medial meniscus tear and referred her for an MRI.  [Tr. 287.] Dr. Ritchie prescribed Naproxen, a nonsteroidal anti-inflammatory drug to treat Plaintiff's pain and inflammation. [Tr. 312.]

On May 31, 2006, Plaintiff was evaluated by Physical Therapist Olivia Olivas for treatment of "bilateral knee pain with left medial meniscus strain." [Tr. 202, 288.] Plaintiff was referred to physical therapy by Dr. Welker. [Id.]  Plaintiff reported to Ms. Olivas that she "twisted her left knee while stepping off a stool at work on 05/16/06." [Id.] She also reported having had bilateral knee pain for several years. [Id.] Plaintiff stated that her pain increases with standing, walking, sitting and bending. [Id.] Plaintiff also stated that using a cane was providing

some relief of her symptoms, and using ice was helping to decrease her pain. [Id.] Ms. Olivas

started Plaintiff on conservative exercise with "e-stim" and suggested treatment once or twice

per week for three to six weeks. [Id.] Ms. Olivas evaluated Plaintiff's rehab potential as "good."

[Id.]

On June 19, 2006, Plaintiff returned to Dr. Ritchie for follow-up on her left knee and to

review the results of her MRI scan. [Tr. 285.]  Dr. Ritchie reported the MRI as showing "a large

buckethandle tear of the lateral meniscus, osteoarthritis in the lateral joint space, with full

thickness cartilage loss at the posterolateral femoral condyle, some joint space narrowing as

well, and what appears to possibly be a tear of the posterior horn of the medial meniscus." [Id.]

Dr. Ritchie recommended operative intervention and the Plaintiff was scheduled for a left knee

arthroscopy.[3] [Id.]

On July 27, 2006, Plaintiff saw Dr. Ritchie for her first post-operative follow-up from her

lateral meniscal repair. [Tr. 284] Plaintiff reported doing well. [Id.] Plaintiff was instructed to

continue using crutches for up to six weeks postop and to use stretching exercises to keep her left

knee joint flexible. [Id.] Dr. Ritchie recommended that Plaintiff use ibuprofen or Aleve to help

with the inflammation she was having and to cut down on the amount of Lortab she was taking.[4]

[Id.] Dr. Ritchie provided Plaintiff with a "return to work notice, limiting her work to modified

duty, limiting her to no standing on the left leg, no bending or squatting, and that she needs to

use crutches." [Id.]

---

The Transcript of Administrative Record does not include a record of Plaintiff's surgery; however, references in collateral records indicate that Plaintiff had surgery on July 21, 2006. [Tr. 189 ]

Dr. Ritchie had prescribed hydrocodone 5mg/500mg tabs x 30 for pain on July 20, 2006, and again on July 24, 2006. [Tr. 312.]

On August 17, 2006, Physical Therapist Olivia Olivas discharged Plaintiff from physical therapy because the Plaintiff never returned after her first visit. [Tr. 198, 283.]

On August 28, 2006, Plaintiff saw Dr. Ritchie for a second post-operative follow-up from her lateral meniscal repair. [Tr. 282.] It had been five weeks since surgery and Plaintiff reported she was doing well.  [Id.] Dr. Ritchie instructed Plaintiff to continue using crutches for one more week and gave Plaintiff a referral for physical therapy for "evaluation, range of motion, strengthening and a home exercise program."  [Id.] Plaintiff informed Dr. Ritchie that she was using Hydrocodone at night to sleep, and he "instructed her to use the anti-inflammatory medication and also ice and elevation for the swelling and pain" [Id.]

On October 4, 2006, Plaintiff was evaluated by Physical Therapist Cathy Bradford for physical therapy following her left lateral meniscus repair. [Tr. 188.] Plaintiff reported she completed twenty minutes of exercise one or twice per week and was not taking any prescription medication for her condition. [Tr. 191.] Plaintiff also reported having extreme difficulty getting up or down ten stairs, and quite a bit of difficulty doing her usual work and housework. [Id.] In addition, Plaintiff reported quite a bit of difficulty walking two blocks. [Id.] Plaintiff assessed her level of pain in the last 24 hours at 4/10, in the last 30 days as 2/10, and at its worst as 8/10. [Id.]

On November 21, 2006, Plaintiff was discharged from physical therapy.  Ms. Bradford evaluated Plaintiff on October 4, 2006, and saw her for one physical therapy session on October 9, 2006. [Id.] Plaintiff then cancelled her next scheduled appointment and stopped going. [Id.]

On March 7, 2007, Plaintiff saw Dr. Welker for a routine diabetes mellitus follow-up. [Tr. 260.] Plaintiff reported that the arthroscopic surgery had helped her knee pain and that she

was no longer using a cane; however, she was still having some pain and popping. [Id.]

Dr. Welker's notes indicated that Plaintiff was "retired." [Id.]  Dr. Welker prescribed over-the-

counter ibuprofen for pain and ordered physical therapy for managing Plaintiff's knee pain. [Id.]

On May 22, 2007, Plaintiff was evaluated by Physical Therapist Helen Senesac for

treatment of her bilateral knee pain. [Tr. 211.] Plaintiff reported being able to walk ten to fifteen

minutes before resting. [Id.] With rest, Plaintiff can then walk again for another ten to fifteen

minutes. [Id.] Plaintiff stated her goal was "to be able to walk and stand for longer periods of

time." [Id.] Plaintiff's initial treatment "consisted of enrolling patient for aquatic therapy to

begin 5/29/07 at noon for one to two session.  She will then transfer to Defined Fitness, which is

closer to her home." [Id.] Plaintiff's treatment plan included seeing Ms. Senesac one to two

times per week for two to three weeks in order to "[t]each Kinesio self-taping and aquatic

therapy to progress to independent program." [Id.] Ms. Senesac indicated the Plaintiff's rehab

potential as "good." [Id.][5]

### B.      Diabetes, Arthritis, High Blood Pressure, Thyroid, and High Cholesterol

The Transcript of Administrative Record documents Plaintiff's ongoing routine follow-

up appointments with Dr. Welker for monitoring her diabetes mellitus through the date last

insured. [Tr. 215-219, 260-61, 264-273.] Plaintiff's medication list also indicates she was

prescribed Glipizide, Lantus, and Byetta for the purpose of controlling and/or treating her

diabetes mellitus during the relevant period. [Tr. 311-312.] On June 12, 2007, Dr. Welker noted

that Plaintiff's adult onset diabetes mellitus was controlled. [Tr. 218.]

---

On July 16, 2007, Plaintiff was discharged from physical therapy. [Tr. 206.]  Ms. Senesac indicated
that Plaintiff was being discharged because after being seen for her initial evaluation on May 22, 2007, she never
called or returned for any of her scheduled visits. [Id.]

The Transcript of Administrative Record contains limited medical record information regarding Plaintiff's medical complaints of arthritis, high blood pressure, thyroid and high cholesterol.  Plaintiff's medication list indicates that through the last date insured, Plaintiff was prescribed medications for hypertension (Lisinopril), thyroid (Levothyroxine), and high cholesterol (Simvastatin). [Tr. 311-312.]

### C.      Medical Assessment of Dr. Tina Welker Dated November 6, 2008

On November 6, 2008, Dr. Tina Welker completed a Medical Assessment on behalf of Plaintiff and was asked to "consider the patient's medical history and the chronicity of findings as from *October 2006* to the current examination."[6] [Tr. 213.] (Emphasis added.)  Dr. Welker's medical assessment states:

### 1.      Non-Physical Work-Related Activities [Tr. 213.]

#### a.      Impairment & Symptoms & Manifestations

Plaintiff suffers from a pain producing impairment, injury or sickness that is severe. [Id.] As a result of her severe impairment, Plaintiff suffers from both sleep disturbances and fatigue. [Id.]  Plaintiff's pain and/or fatigue necessitates that she rest or lie down at regular intervals. [Id.]

#### b.      Limitations Affecting Non-Physical Work Activities

Plaintiff has *moderate* limitations with respect to (i) maintaining attention and concentration for extended periods (approximately 2-hour segments between arrival and first break, lunch, second break and departure); (ii) performing activities within a schedule;

---

On November 23, 2009, Dr. Welker prepared a second Medical Assessment of Plaintiff's ability to do physical and non-physical work-related activities. [Tr. 302-303.] This Medical Assessment evaluates Plaintiff's abilities from November 8, 2008, through November 23, 2009, a time frame well beyond Plaintiff's date last insured. Therefore, Dr. Welker's second Medical Assessment will not be addressed herein as evidence.

(iii) maintaining regular attendance and being punctual within customary tolerance;

(iv) maintaining physical effort for long periods without a need to decrease activity or pace, or to

rest intermittently; (v) sustaining an ordinary routine without special supervision; and

(vi) completing a normal workday and workweek without interruptions from pain or fatigue

based on symptoms and to perform at a consistent pace without unreasonable number and length

of rest periods. [Id.]  Plaintiff has *slight* limitations with respect to (i) working in coordination

with/or in proximity to others without being distracted by them; and (ii) making simple work-

related decisions. [Id.]  Plaintiff has pain in her knees, suffers poor sleep due to pain, and has an

appointment to see orthopedics. [Id.]  Plaintiff's non-physical work-related activities are

minimally affected – "mostly due to fatigue, loss of sleep." [Tr. 214.]

### 2. **Physical Work-Related Activities** [Tr. 214.]

#### a. **Physical Effort**

Plaintiff cannot maintain physical effort for long periods without a need to decrease her

activity or pace, or to rest intermittently because of pain and fatigue. [Id.]

#### b. **Lifting**

Plaintiff can occasionally and frequently [sic] lift and/or carry less than 5 pounds because

she fatigues easily and suffers degenerative changes as indicated on x-rays from 2006. [Id.]

#### c. **Standing and Walking**

Plaintiff can stand and/or walk for a total of less than 2 hours in an 8-hour workday. [Id.]

#### d. **Sitting**

Plaintiff can sit for a total of less than 4 hours in an 8-hour workday because if she sits

for too long, her joints stiffen.  Plaintiff needs to be able to shift positions. [Id.]

### e.      Pushing and Pulling

Plaintiff has an unlimited ability to push and pull, other than as shown for lift and/or

carry limitations. [Id.]

### f.      Manipulative

Plaintiff can do repetitive handling and fingering with both her right and left hands;

however, Plaintiff has limited reach over her head due to fatigue. [Id.]

### g.      Posture

Plaintiff can never engage in kneeling, stooping, crouching or crawling. [Id.]

## IV. DISCUSSION

### A.      Controlling Weight of Treating Physician Dr. Tina Welker's Opinion

Plaintiff asserts that the ALJ committed reversible error by failing to evaluate Plaintiff's

evidence according to her treating physician's medical source statements (both the November 6,

2008, Medical Assessment and the November 23, 2009, Medical Assessment) as required under

SSR 96-2p in tandem with SSR 96-8p. [Motion at 4.] In addition, Plaintiff claims that the ALJ

(i) failed to assess what weight was given to the Plaintiff's treating physician; (ii) failed to

provide a "concrete specific rationale explaining why these two (2) medical assessments are not

entitled to controlling weight"; and (iii) failed to explain the alleged inconsistency with other

medical evidence in the record. [Motion at 4, 8.]  Plaintiff contends that Dr. Welker's

assessments of Plaintiff were entitled to controlling weight because she had "treated Ms. Barela

for over 25 years, and the record supported her assessments." [Id.]

Defendant contends that the ALJ carefully considered the entire record in assessing

Plaintiff's RFC and specifically discussed the opinions offered by Plaintiff's treating physician,

Dr. Welker. [Response at 4.] In addition, Defendant submits that a treating physician's opinion is

entitled to controlling weight if it is both (1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and (2) is not inconsistent with the other substantial evidence in the record. [Id.]  In this regard, Defendant argues that the ALJ "discounted the limitations Dr. Welker assessed because they were inconsistent with the other medical evidence of record for the period at issue." [Response at 6.] Finally, Defendant contends that the ALJ is not required, as Plaintiff suggests, to expressly discuss or apply each and every factor considered by the ALJ in determining when a treating physician's opinion is not given controlling weight. [Id.]

On November 6, 2008, Dr. Welker completed a Medical Assessment on behalf of the Plaintiff and was asked to consider the patient's medical history and the chronicity of findings as from *October 2006* to the current examination.  Dr. Welker filled out a questionnaire specifying various work-related limitations attributed to the pain and fatigue associated with Plaintiff's impairments. Among these were significant exertional restrictions: a need to decrease her activity or pace or to rest intermittently throughout the day; lifting/carrying limited to less than 5 pounds; standing/walking limited to less than two hours per day; sitting limited to four hours per day; and kneeling, stooping, crouching and crawling completely restricted. [Tr. 214.]  In addition, Dr. Welker noted that Plaintiff's pain and fatigue would moderately limit Plaintiff's attention and concentration, her pace of work and completion of tasks in a timely manner, and her maintaining regular attendance. [Id.]  The impact of such limitations was confirmed at the hearing by the VE, who stated that if these limitations were accepted Plaintiff "wouldn't be able to do an eight-hour day, a gainfully employed job." [Tr. 55.]

A treating physician's medical opinion is subject to a two-step inquiry.  The initial determination the ALJ must make with respect to a treating physician's medical opinion is whether it is conclusive; i.e., to be accorded "controlling weight," on the matter to which it

relates. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir.2003). Such an opinion must be

given controlling weight if it is well-supported by medically acceptable clinical or laboratory

diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Id.*

(applying SSR 96–2p, 1996 WL 374188, at *2); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If

the opinion is deficient in either of these respects, it is not to be given controlling weight.

The finding of such deficiencies to resolve the controlling-weight question against a

claimant does not end the inquiry. Even if a treating opinion is not given controlling weight, it is

still entitled to deference.  At the second step in the analysis, the ALJ must make clear how

much weight the opinion is being given (including whether it is being rejected outright) and give

good reasons, tied to the factors specified in the cited regulations for this particular purpose, for

the weight assigned.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011) (quoting *Watkins*,

350 F.3d at 1300–01).  If this is not done, a remand is required. *Id.*

The Tenth Circuit has summarized the following factors at the second inquiry by the ALJ

for determining how much weight a treating opinion is being given:

> (1) the length of the treatment relationship and the frequency of examination; (2) the
> nature and extent of the treatment relationship, including the treatment provided and
> the kind of examination or testing performed; (3) the degree to which the physician's
> opinion is supported by relevant evidence; (4) consistency between the opinion and
> the record as a whole; (5) whether or not the physician is a specialist in the area upon
> which an opinion is rendered; and (6) other factors brought to the ALJ's attention
> which tend to support or contradict the opinion.

*Id*. at 1331 (quotation omitted).  When applying these factors, the ALJ's findings must be

"sufficiently specific to make clear to any subsequent reviewer the weight he gave to the treating

source's medical opinion and the reason for that weight."  *Id*.  (Alteration omitted) (quotation

omitted).  However, an ALJ need not explicitly discuss every factor because "not every factor

for weighing opinion evidence will apply in every case." *Oldham v. Astrue*, 509 F.3d 1254,

1258 (10ᵗʰ Cir. 2007) (alteration omitted) (quotation omitted).

In this matter, the ALJ adequately referenced each of Plaintiff's appointments with

Dr. Welker wherein Plaintiff complained about her knee pain. [Tr. 23-24.] The ALJ also

discussed the collateral care Plaintiff received based on Dr. Welker's referrals to Dr. William

Ritchie of New Mexico Orthopaedics and to multiple physical therapy regimens. [Id.] Finally,

the ALJ summarized both of the Medical Assessments prepared by Dr. Welker as follows:

> Dr. Welker submitted a Medical Assessment of Ability to Do Work-Related
> Activities (Physical) on November 6, 2008 for the period October 2006 to Present.
> In her assessment, Dr. Welker indicated that Ms. Barela could occasionally lift
> and/or carry less than five pounds and could frequently lift and/or carry less than five
> pounds; that she could stand and/or walk with normal breaks for a total of less than
> two hours in an eight-hour work day; that could sit with normal breaks for a total of
> less than four hours in an eight-hour work day; that she was unlimited in her ability
> to push and/or pull; that she was able to perform fine and gross manipulations with
> both her right and left hands; that she was limited in her ability to reach overhead due
> to fatigue; and that she could never kneel, stoop, crouch, or crawl.  (Exhibit 2F)
> Dr. Welker submitted a similar Medical Assessment on November 23, 2009,[7]
> covering the period November 6, 2008 to the most current examination.
> (Exhibit 10F/2) Additionally, she provided a Non-Physical Medical Assessment,
> which indicated that Ms. Barela suffered from severe pain, fatigue, sleep problems,
> indicated that Ms. Barela had moderate limitations in her ability to maintain attention
> concentration for extended periods; to perform activities within a schedule; to
> maintain regular attendance and be punctual within customary tolerances; and to
> sustain an ordinary routine without special supervision.  She further indicated
> Ms. Barela had marked limitations in her ability to maintain physical effort for long
> periods without a need to decrease activity or pace, or to rest intermittently and to
> complete a normal workday and work week without interruptions from pain or
> fatigue based symptoms to perform at a consistent pace without an unreasonable
> number and length of rest periods.  She indicated Ms. Barela had continued knee
> pain due to arthritis requiring regular opiates for pain control.

[Tr. 25.]

---

The ALJ discusses the findings in Dr. Welker's second Medical Assessment.  However, as previously
noted, this Medical Assessment falls well outside the date last insured and will not be considered as evidence herein.

In conclusion, the ALJ stated, "I do not fully credit Dr. Welker's evaluations because they are inconsistent with the other medical evidence of record for the period in question." [Id.] The ALJ then addressed only the inconsistency of Dr. Welker's indication in the second Medical Assessment that Plaintiff requires regular opiates for pain control in relationship to the medical records during the relevant period. [Tr. 26.] The ALJ's second step inquiry ended there.

Defendant concedes that "it would have been preferable for the ALJ to provide a more detailed analysis of why she found specific evidence inconsistent with Dr. Welker's assessment." [Response at 6.] This concession, however, falls short because the second step inquiry is not simply "preferable" but is required. As noted above, the ALJ *must* make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011) (quoting *Watkins*, 350 F.3d at 1300–01) (emphasis added).

Here, the ALJ was not sufficiently specific nor did she make clear to any subsequent reviewer the weight she gave to Dr. Welker's medical opinion and the reason for that weight through the date last insured. And while the record may offer clues and speak for itself regarding how the ALJ may have come to her determination regarding the inconsistencies between Dr. Welker's evaluations and the other medical evidence, post-hoc efforts by this Court to work through the omitted second step for the ALJ is prohibited. Finally, Defendant is correct that an ALJ need not explicitly discuss every factor because not every factor for weighing opinion evidence will apply in every case. Here, however, the ALJ is silent with respect to discussing any of the factors required at the second step for the relevant period of time in this case. This is error and requires remand.

**B.** **Burden at Step Five**

The Court further notes that in the ALJ's recitation of the five-step sequential process,

the ALJ inaccurately stated the burden at step five.  In her decision, the ALJ wrote that the

"claimant generally continues to have the burden of proving disability at this step," although "a

limited burden of going forward with the evidence shifts to the Social Security Administration."

[Tr. 22.]  The Tenth Circuit Court of Appeals explained if the claimant established at step four

that he cannot return to his past relevant work, the burden of proof shifts to the commissioner at

step five to show that he retains the RFC to perform working the national economy, given his

age, education and work experience.  *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).

In an unpublished opinion, the Tenth Circuit stated that "[t]he claimant has no burden at step

five."  *Steward v. Shalala*, 999 F.2d 548, at *1 (Table, Text in Westlaw), 1993 WL 261958 (10th

Cir. June 28, 1993) (citing *Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir. 1993)).

**C.** **Remaining Claims**

Finally, the Court will not address Plaintiff's remaining claims of error at step four.

*Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining

issues raised by appellant because they may be affected by the ALJ's treatment of this case on

remand.").

**RECOMMENDED DISPOSITION**

For the reasons discussed above, I recommend finding that Plaintiff's Motion to Reverse

or Remand Administrative Decision [Doc. 22] be granted.

Timely objections may be made pursuant to 28 U.S.C. § 636(b)(1)(c).  Within fourteen

(14) days after a party is served with a copy of these proposed findings and recommendations

that party may, pursuant to  § 636(b)(1)(c), file written objections to such proposed findings and

recommendations with the Clerk of the United States District Court for the District of

New Mexico.  A party must file any objections within the fourteen (14) days period allowed if

that party wants to have appellate review of the proposed findings and recommendations.  If no

objections are filed, no appellate review will be allowed.


        **ALAN C. TORGERSON**
        **United States Magistrate Judge**